**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

―――――――――――

**No. 22-1121**

―――――――――――

EDDIE LANE,

Plaintiff - Appellant,

v.

NEW GENCOAT, INC.,

Defendant - Appellees,

and

GENESIS WORLDWIDE II, INC.; PEGASUS PARTNERS II, LP; KPS SPECIAL SITUATIONS FUNDS LP; GENCOAT, INC.; GENESIS WORLDWIDE, INC.; MITSUBISHI HEAVY INDUSTRIES, LTD; MITSUBISHI HEAVY INDUSTRIES AMERICA, INC.; HITACHI, LTD.; HITACHI AMERICA, LTD.; MITSUBISHI-HITACHI METALS MACHINERY, INC.; MITSUBISHI-HITACHI METALS MACHINERY USA, INC.; PRIMETALS TECHNOLOGIES, LTD.; PRIMETALS TECHNOLOGIES USA HOLDINGS, INC.; PRIMETALS TECHNOLOGIES USA, LLC,

Defendants.

―――――――――――

Appeal from the United States District Court for the District of South Carolina, at Columbia.  J. Michelle Childs, District Judge.  (3:18-cv-01386-JMC)

―――――――――――

Argued:  January 24, 2023                    Decided:  April 11, 2023

―――――――――――

Before HARRIS, RICHARDSON, and RUSHING, Circuit Judges.

―――――――――――

Affirmed by unpublished opinion.  Judge Harris wrote the opinion, in which Judge Richardson and Judge Rushing joined.

_____

**ARGUED:**  Hannah Rogers Metcalfe, METCALFE & ATKINSON, LLC, Greenville, South Carolina, for Appellant.  Scottie Forbes Lee, ELLIS & WINTERS LLP, Greensboro, North Carolina, for Appellee.  **ON BRIEF:**  John C. Newton, Allison P. Sullivan, BLUESTEIN THOMPSON SULLIVAN, LLC, Columbia, South Carolina, for Appellant. Jon Berkelhammer, ELLIS & WINTERS LLP, Greensboro, North Carolina; John T. Lay, Jr., GALLIVAN, WHITE & BOYD, P.A., Columbia, South Carolina, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit.

PAMELA HARRIS, Circuit Judge:

Plaintiff Eddie Lane, an employee at a South Carolina steel-processing plant, suffered severe injuries when his hand was caught in a large piece of industrial machinery. He then brought this state-law product liability action alleging that the machine was unreasonably dangerous. Because the machine's original manufacturer had gone bankrupt, Lane sued New Gencoat, Inc., which had acquired the manufacturer's assets out of bankruptcy. Under South Carolina law, however, a corporation that purchases another company's assets does not generally assume its liabilities. *Nationwide Mut. Ins. Co. v. Eagle Window & Door, Inc.*, 818 S.E.2d 447, 451 (S.C. 2018). A narrow exception to this rule imposes liability if the purchaser is "a mere continuation of the predecessor." *Id.* But here, the record reflects only a legitimate, arms-length asset sale between unrelated parties. Accordingly, Lane cannot hold New Gencoat liable for his injuries, and we affirm the district court's judgment in favor of the defendant.

## I.

### A.

On April 6, 2015, Eddie Lane was working at a steel-processing factory owned by Consolidated Systems, Inc. ("CSI"). Lane was responsible for maintaining the factory's metal-coating machines, which apply even layers of paint and other substances to steel by feeding strips of sheet metal through a series of large rollers. While Lane was cleaning one machine – called a "shuttle coater" – his rag became caught in the moving rollers, pulling

3

his hand into the machine. The accident caused catastrophic injuries to Lane's hand, which was later amputated.

Lane then commenced this product liability action, alleging various defects in the shuttle coater's design. But the company that originally manufactured the shuttle coater – Gencoat, Inc. – no longer existed, having liquidated almost 15 years prior to Lane's accident. However, a joint venture that purchased Gencoat's assets from bankruptcy had formed a new corporate entity – creatively, New Gencoat, Inc. – to continue Gencoat's business enterprise. So Lane sued New Gencoat instead, contending that it remained liable as Gencoat's corporate "successor." The parties now dispute whether New Gencoat, by acquiring Gencoat's assets and continuing its business operation, also assumed its liabilities and obligations. And to answer this question, we must first review the facts of that acquisition.

**B.**

Gencoat, Inc., was initially formed in 1968 to manufacture metal-processing equipment. In 2000, Gencoat sold CSI the shuttle coater at issue in this case. The 11.5-ton machine was installed in CSI's South Carolina plant, where it remains virtually unmoved to this day.

At the time of the sale, Gencoat was owned by Genesis Worldwide, Inc. ("Genesis I"), a publicly traded industrial holding company. But less than a year later, Genesis I filed for bankruptcy; as its wholly owned subsidiary, Gencoat declared bankruptcy as well. Genesis I's bankruptcy was "pre-packaged," which means that its restructuring plan was negotiated with creditors and approved by shareholders before it

4

filed its Chapter 11 petition.  As part of that plan, two outside private equity firms – Pegasus Partners II, L.P., and KPS Special Situations Fund, L.P. – agreed to purchase substantially all of Genesis I's assets, including Gencoat's assets.

To hold these assets, Pegasus and KPS formed two new corporations:  Genesis Worldwide II, Inc. ("Genesis II"), and New Gencoat, Inc.  Like its predecessor, Genesis II acted as a holding company, with New Gencoat as a wholly owned subsidiary.  And at New Gencoat, business continued largely unchanged.  Gencoat's assets were assigned to New Gencoat, which continued to manufacture the same products under the same trade name.  Alan Roehrig, who had served as Gencoat's president and CEO since 1991, continued in that role.  Both before and after the acquisition, Roehrig managed Gencoat's day-to-day operations, with little active oversight from ownership at either Genesis I or Genesis II.

That ownership, however, entirely changed hands with the asset sale.  Prior to its bankruptcy, Genesis I – a publicly traded company – was owned by its dispersed shareholders.  Genesis II, meanwhile, was owned by its two private-equity backers, which installed a new CEO and board of directors.  There is no evidence that Pegasus and KPS were anything but independent, arms-length purchasers, nor that any members of Genesis I's management continued on with Genesis II.  And though Roehrig continued to run New Gencoat's daily operations, he played no role in higher-level corporate decisions, including Genesis I's decision to file for bankruptcy and sell its assets to Pegasus and KPS. Accordingly, though New Gencoat's business operation looked very similar to Gencoat's, the two shared neither a corporate identity nor common ownership.

## II.

With this background in mind, we return to Lane's case.  In 2018, Lane filed this product liability action in state court, on the theory that New Gencoat remained liable for the shuttle coater's defects as Gencoat's corporate successor.[1]  After removing the case to federal court based on diversity of citizenship and conducting partial discovery, New Gencoat moved for summary judgment on the issue of successor liability.

In South Carolina, New Gencoat noted, a purchasing corporation does not become responsible for a predecessor company's liabilities merely by acquiring its assets. *Nationwide Mut. Ins. Co. v. Eagle Window & Door, Inc.*, 818 S.E.2d 447, 451 (S.C. 2018). And though there is an exception to that rule when "the successor company [is] a mere continuation of the predecessor," *id.*, New Gencoat argued that it was not a "mere continuation" of Gencoat.  The mere continuation standard, New Gencoat pointed out, is a "strict one," allowing successor liability only when the purchasing corporation has "substantially the same . . . officers, directors *and* shareholders" as the original.  *Id.* at 452–53 (quoting *Simmons v. Mark Lift Indus., Inc.*, 622 S.E.2d 213, 215 n.1 (S.C. 2005)).  And here, where ownership had entirely changed hands with the asset sale, New Gencoat contended that the mere continuation test plainly could not be satisfied.

---

[1] As defendants, Lane initially named 15 entities allegedly involved in the manufacture and sale of the shuttle coater.  He later voluntarily dismissed every defendant but New Gencoat.

6

The district court denied New Gencoat's motion. The court recognized that the "burden" to prove mere continuation liability is "intentionally high," and generally requires that the selling and purchasing corporations have common ownership. *Lane v. New Gencoat, Inc.*, No. 3:18-CV-01386-JMC, 2020 WL 1494072, at *3 (D.S.C. Mar. 27, 2020). But as the court noted, the South Carolina Supreme Court does not deem common ownership strictly necessary to prove mere continuation liability. In particular, the Supreme Court has recognized that "there may be instances where directors or officers – lacking ownership – exert such control and influence over a corporation that their continued presence after a corporate acquisition is sufficient to establish successor liability." *Id.* (quoting *Nationwide*, 818 S.E.2d at 454–55). And here, the court found Alan Roehrig's apparent control over both Gencoat's and New Gencoat's business operations sufficient, on the then-existing record, to defeat summary judgment. *Id.* at *3–4 (finding "a genuine issue of material fact" as to whether "Roehrig asserted the level of control needed to overcome the 'high burden' of the mere continuation test" (internal quotation marks omitted)).[2]

New Gencoat then requested that the district court certify its ruling for an interlocutory appeal to the Fourth Circuit. *See* 28 U.S.C. § 1292(b). After the court denied that motion, the parties proceeded with discovery. At the close of discovery, New Gencoat

---

[2] Additionally, the district court noted, Genesis I's bankruptcy estate received a 5 percent interest in Genesis II for the limited purpose of distributing that interest to Genesis I's unsecured creditors. The court left open "whether an ownership interest held post-bankruptcy amounts to common shareholder interest in New Gencoat." *Id.* at *3.

7

again moved for summary judgment.  On successor liability, New Gencoat submitted new testimony from the former CEOs of both Genesis I and Genesis II at the time of the asset sale.  Each officer clarified that although Roehrig controlled New Gencoat's day-to-day operations, he was uninvolved in higher-level corporate decision-making.  And both Genesis I's CEO and Roehrig himself confirmed that he played no role in Genesis I's decision to declare bankruptcy or sell Gencoat's assets to KPS and Pegasus.  This type of ordinary, day-to-day operational authority exercised by all CEOs, New Gencoat urged, is not the sort of unusual "control and influence" that may give rise to successor liability in lieu of common ownership.

New Gencoat also put forth two new grounds for summary judgment.  First, New Gencoat argued that Lane could not prevail on the merits.  In particular, New Gencoat claimed that the shuttle coater was not unreasonably dangerous as a matter of law and that, in any event, Lane's own misuse of the machine barred his claims.  And second, New Gencoat contended that Lane's suit was barred by South Carolina's eight-year statute of repose for claims arising from improvements to real property.  *See* S.C. Code § 15-3-640 (providing that no action "arising out of the defective or unsafe condition of an improvement to real property may be brought more than eight years after substantial completion of the improvement").  Here, New Gencoat argued that the 11.5-ton shuttle coater, which was installed roughly 15 years prior to Lane's accident, was not a piece of standalone equipment but rather a permanent improvement to CSI's factory itself.  If true, the statute of repose would render Lane's claims untimely.

8

The district court granted summary judgment based on the statute of repose alone. *See Lane v. New Gencoat, Inc.*, No. 3:18-CV-01386-JMC, 2022 WL 62709 (D.S.C. Jan. 6, 2022). As the court recognized, "[t]he courts of South Carolina have not had nor taken the opportunity to address industrial equipment within the context of the statute of repose." *Id.* at *5 n.4 (quoting *Ervin v. Cont'l Conveyor & Equip. Co.*, 674 F. Supp. 2d 709, 715 (D.S.C. 2009)). But despite this "lack of specific precedential authority" on point, *id.*, the court concluded that the South Carolina Supreme Court would likely deem the shuttle coater a "permanent" improvement to the underlying property. *Id.* at *6 (noting that the shuttle coater "weighed 11.5 tons, was bolted to the floor," and "was still in CSI's facility in the same location . . . some twenty (20) years later"). Accordingly, the court held that the statute of repose applied, dismissed Lane's action as time-barred, and "decline[d] to consider the parties' remaining arguments," including the matter of successor liability. *Id.* at *6 & n.9.

## III.

### A.

On appeal, New Gencoat reprises each of its grounds for summary judgment: that it is not liable as Gencoat's corporate successor, that Lane's claims are barred by the eight-year statute of repose for improvements to real property, and that it prevails on the merits as a matter of law. The district court, of course, dismissed Lane's case based solely on the statute of repose. But we are "entitled to affirm on any ground appearing in the record,

9

including theories not relied upon or rejected by the district court." *United States v. Flores-Granados*, 783 F.3d 487, 491 (4th Cir. 2015) (internal quotation marks omitted).

Because federal jurisdiction here rests on the parties' diversity of citizenship, we apply South Carolina law. *See Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). In determining South Carolina law, "we start with the decisions of the South Carolina Supreme Court, giving appropriate effect to all their implications." *Zeigler v. Eastman Chem. Co.*, 54 F.4th 187, 194 (4th Cir. 2022) (cleaned up). And "[t]o the extent the state's highest court has not 'directly addressed' an issue, we 'anticipate' what its decision would be." *Id.* (quoting *Stahle v. CTS Corp.*, 817 F.3d 96, 100 (4th Cir. 2016)).

As the district court recognized, "anticipating" whether the shuttle coater is an "improvement to real property" presents a difficult task. The South Carolina Supreme Court has never "taken the opportunity to address industrial equipment" like the shuttle coater at issue here "within the context of the statute of repose." *Lane*, 2022 WL 62709, at *5 n.4 (quoting *Ervin*, 674 F. Supp. 2d at 715); *see also id.* (noting the "lack of specific precedential authority" on point). Indeed, the Supreme Court has interpreted the contours of an "improvement to real property" on just one occasion, and it there gave only general guidance. *See S.C. Pipeline Corp. v. Lone Star Steel Co.*, 546 S.E.2d 654, 657 (S.C. 2001) (holding that an underground natural gas pipeline was an "improvement" to the surrounding property because it was "permanent as that phrase is commonly understood").[3]

---

[3] A review of other state courts' interpretations of analogous statutes of repose, moreover, reveals no consensus position on how to categorize large pieces of industrial

10

Accordingly, though the district court carefully analyzed the shuttle coater's relative "permanence" in deeming it an improvement, we cannot be entirely confident that the Supreme Court would reach the same conclusion. *Cf. Colo. Bankers Life Ins. Co. v. Acad. Fin. Assets, LLC*, 60 F.4th 148, 156 (4th Cir. 2023) ("It is certainly possible the Supreme Court of North Carolina . . . would see matters differently than we have.").

## B.

We need not wade into these still-unsettled waters of state law to decide the case in front of us. Instead, we can affirm the judgment on an alternative basis: that New Gencoat cannot be held liable as Gencoat's corporate successor. On this ground, "we need not do much anticipating," as the Supreme Court's clear directives "squarely resolve[] the case before us." *Zeigler*, 54 F.4th at 194.

As a general principle of corporate law, a corporation that purchases another company's assets does not assume its liabilities. *See Nationwide*, 818 S.E.2d at 454 (noting that "corporate law generally favors the free transfer of assets"). In South Carolina, there are only four exceptions to this rule:

> (1) there was an agreement to assume such debts; (2) the circumstances surrounding the transaction amount to a consolidation or merger of the two corporations; (3) the successor company was a mere continuation of the predecessor; or (4) the transaction was entered into fraudulently for the purpose of wrongfully defeating creditors' claims.

---

equipment. *Compare, e.g.*, *Anderson v. M.W. Kellogg Co.*, 766 P.2d 637, 641 (Colo. 1988), *with Condit v. Lewis Refrigeration Co.*, 676 P.2d 466, 468–69 (Wash. 1984).

*Id.* at 451 (citing *Brown v. American Ry. Express Co.*, 123 S.E. 97 (S.C. 1924)).  Lane's claims against New Gencoat rest entirely on the third theory of liability:  the "mere continuation" exception.

In common parlance, it may seem that New Gencoat was indeed a "mere continuation" of its predecessor, Gencoat.  After purchasing Gencoat's assets, KPS and Pegasus assigned those assets directly to New Gencoat, which continued to manufacture the same products under the same trade name.  New Gencoat retained Gencoat's key personnel, including its CEO, who continued to run the company's day-to-day operations.  Indeed, to the outside observer, Gencoat and New Gencoat may have looked functionally identical.

But this colloquial reading fundamentally misconstrues both the purposes and the stringent requirements of the mere continuation exception.  As a narrow, equitable carve-out from corporate law's presumption "favor[ing] the free transfer of assets," the doctrine does not impose successor liability simply because an unrelated purchaser chooses to continue the predecessor's business enterprise.  *Nationwide*, 818 S.E.2d at 454.  Instead, the exception aims "to prevent a change in legal obligations as a result of a transaction that is essentially a sham" – that is, to impose liability on a successor company when the asset sale "is little more than a shuffling of corporate forms, lacking any fundamental change with independent significance."  Phillip I. Blumberg, *The Continuity of the Enterprise Doctrine:  Corporate Successorship in United States Law*, 10 Fla. J. Int'l L. 365, 371 (1996).

12

Accordingly, the South Carolina Supreme Court – following the "majority of courts interpreting the mere continuation exception" – has "found it applicable only when there is commonality of ownership, *i.e.*, the predecessor and successor corporations have substantially the same . . . officers, directors and shareholders." *Simmons*, 622 S.E.2d at 215 n.1; *see Nationwide*, 818 S.E.2d at 454 ("Although the mere continuation test is a high burden for a plaintiff to meet, it is intentionally so . . . .").

True, some states have adopted a broader "continuity of enterprise" exception in cases "where the successor benefitted from the goodwill of the predecessor without sharing the liabilities." *Stanley v. Miss. State Pilots of Gulfport, Inc.*, 951 So. 2d 535, 539–40 (Miss. 2006); *see, e.g.*, *Turner v. Bituminous Cas. Co.*, 244 N.W.2d 873, 883–84 (Mich. 1976) (imposing liability where "[t]here was basic continuity of the enterprise of the seller corporation, including . . . a retention of key personnel, assets, general business operations, and even the . . . name"). But as recently as 2018, the South Carolina Supreme Court "unequivocally rejected" a "broader enterprise continuation doctrine," *Nationwide*, 818 S.E.2d at 451, and declined "to extend the exception beyond instances where there is commonality of officers, directors, and shareholders," *id.* at 453.

This simple test resolves the case before us. By retaining Gencoat's key personnel, assets, and trade name, New Gencoat may well have continued its predecessor's business enterprise. But ownership plainly changed hands as a result of the asset sale: Gencoat was owned by Genesis I and its public shareholders, while New Gencoat was owned by Genesis II and its private-equity backers. Rather than a mere "shuffling of corporate forms," the record here reflects a legitimate, arms-length asset sale between independent parties. In

13

such scenarios – and in lieu of any "commonality of ownership" – the Supreme Court has made clear that successor liability does not attach.[4]

Attempting to avoid this straightforward conclusion, Lane notes that the South Carolina Supreme Court's recent *Nationwide* decision included the following caveat:

> We recognize the mere continuation test is a strict one, but we temper our holding by noting it is not completely inflexible.  While commonality of ownership is a keystone of the analysis and almost always sufficient to establish mere continuation when paired with common directors and officers, we stress control is an essential consideration as well.  Typically, ownership and control are found in tandem; *however, there may be instances where directors or officers – lacking ownership – exert such control and influence over a corporation that their continued presence after a corporate acquisition is sufficient to establish successor liability.*

*Nationwide*, 818 S.E.2d at 454 (emphasis added).  Lane contends that this is one such instance, as CEO Alan Roehrig's "authority and control of both Gencoat and New Gencoat" comprises the type of sustained "control and influence" that supports mere continuation liability in lieu of shared ownership.  In particular, Lane points to Roehrig's continuing authority over "capital expenditure proposals; quotes for customers; entering

---

[4] Lane, we should note, does not concede that Gencoat and New Gencoat lacked common ownership.  As Lane points out, Genesis I's bankruptcy estate briefly received a 5 percent ownership stake in Genesis II for the limited purpose of distributing that stake to Genesis I's unsecured creditors.  But South Carolina law provides no support for the notion that such a fleeting, transitory interest may comprise the "substantial[]" commonality of ownership required to prove a mere continuation. *Nationwide*, 818 S.E.2d at 453 (quoting *Simmons*, 622 S.E.2d at 215 n.1).  We also recognize that one of Genesis I's large, secured creditors – ING US LLC – received a 15 percent equity stake in Genesis II pursuant to the pre-packaged bankruptcy agreement.  There is no evidence that ING had any ownership interest in Genesis I, however, and no party contends that ING's minority position in Genesis II is relevant to the issues presented on appeal.

into confidential agreements, contracts, and agreements with customers; and personnel matters," as probative of his "control" over both entities.

Lane's interpretation of this "control and influence" caveat – a narrow exception to the mere continuation doctrine, which is itself a narrow exception to the general rule against successor liability – cannot bear the weight he places on it. Indeed, if corporate officers' continuing control over day-to-day affairs were sufficient to establish successor liability, this exception would swallow the rule, and South Carolina's mere continuation doctrine would collapse into the very "continuity of enterprise" standard that the *Nationwide* Court "flatly rejected." 818 S.E.2d at 453.

Instead, as the *Nationwide* Court made clear, this "control and influence" caveat is geared at the same equitable concern as the mere continuation exception itself: cases in which "the changing of corporate hats is tainted by . . . fraudulent intent." *Id.* at 454. In some cases, shared directors or officers – though lacking formal ownership – may themselves be "the drivers" of a sham asset sale structured to avoid successor liability. *Id.* at 454 n.11. And in such situations, the Supreme Court recognized, its "strict" test may be "flexible" enough to recognize a mere continuation where it plainly exists.

For example, in *In re AuditHead, LLC*, 624 B.R. 134, 139 (Bankr. D.S.C. 2020), a bankruptcy court applied *Nationwide*'s "control and influence" caveat to find a possible mere continuation in lieu of common ownership. There, John Taylor, the owner and CEO of a company called AuditHead, was sued by a former employee for various Title VII violations. *Id.* at 138. While the lawsuit was pending, Taylor's wife formed another corporation, TCVG, that performed the same services as AuditHead. *Id.* at 139. Taylor

15

then shut down AuditHead, joined TCVG as President, and hired AuditHead's employees to perform the same labor for TCVG. *Id.* As the court noted, there was "no commonality of ownership among AuditHead and TCVG" – Taylor owned AuditHead, and his wife owned TCVG. *Id.* at 141. Nonetheless, the court found a material issue of fact, under *Nationwide*, as to whether "Taylor exerted such control and influence that, despite . . . new ownership, AuditHead's presence continued through TCVG." *Id.* at 142.

It is in these rare situations – where parties structure a "shuffling of corporate forms" to avoid not just successor liability *but also* the application of the mere continuation exception – that *Nationwide* preserves flexibility. But this exception-to-an-exception does not create successor liability whenever shared employees continue to perform similar functions. As the *Nationwide* Court emphasized, where shared officers and directors are "merely along for the ride, rather than the drivers" of the asset sale, their continued presence cannot establish successor liability. 818 S.E.2d at 454 n.11.

Here, it is undisputed that Roehrig "was merely along for the ride, rather than the driver[]" of Genesis I's decision to sell Gencoat's assets to KPS and Pegasus. Genesis I's CEO testified that Roehrig played no role in the asset sale, and Roehrig himself admitted he was only dimly aware that the sale occurred. Instead, Lane's "control and influence" argument simply repackages continuing enterprise liability in another form. And "[w]hile there arguably may be merits to expanding South Carolina's successor liability test to include the continuity of enterprise theory, that is not the question currently before" us. *Nationwide*, 818 S.E.2d at 453. Sitting in diversity, we must anticipate how the South Carolina Supreme Court would resolve this case. And by "unequivocally" rejecting

16

continuing enterprise liability, *id.* at 451, the Supreme Court has made its answer clear. Because New Gencoat is not a mere continuation of Gencoat – as defined by "commonality of officers, directors *and* shareholders" – it cannot be held liable as Gencoat's corporate successor. *Id.* at 453 (quoting *Simmons*, 622 S.E.2d at 215 n.1).

## IV.

For the reasons given above, we affirm the district court's order granting summary judgment to the defendant.

*AFFIRMED*